NO SUMMONS ISSUED

NO SUMMONS ISSUED

FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

ABC,

           Plaintiff,

    v.

    CV-13 2795

XYZ,

           Defendants.

----------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   MAY 1 - 2013   ★

LONG ISLAND OFFICE

**FILED <u>UNDER SEAL</u>
PURSUANT TO 31 U.S.C.
§§ 3729 et. seq.**

BIANCO, J.

BOYLE, M

<u>**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL FALSE CLAIMS ACT**</u>

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| LAUREN ANDERSEN [pro se] | ) | |
| Relator, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | _____ |
| | ) | |
| | ) | **QUI TAM** |
| the NORTH SHORE LONG ISLAND | ) | **COMPLAINT** |
| JEWISH HEALTHCARE SYSTEM | ) | |
| ("LIJ"), and Michael J. DOWLING, | ) | |
| President and Chief Executive Officer | ) | **FILED UNDER SEAL** |
| | ) | |
| and | ) | |
| | ) | |
| UnitedHealth Group ("UH"), | ) | |
| and Stephen J. HEMSLEY, | ) | |
| President and Chief Executive Officer | ) | |
| | ) | |
| Defendants. | ) | |

**RELATOR'S COMPLAINT PURSUANT TO 31 U.S.C §§ 3729 et. seq.**

**OF THE FEDERAL FALSE CLAIMS ACT**

On Behalf of the United States of America, *qui tam* relator Lauren Andersen (Relator), brings this action under 31 U.S.C §3729, *et seq.,* as amended (False Claims Act) to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States.

**I. PRELIMINARY STATEMENT**

1.       This is an action to recover damages and civil penalties on behalf of the United States of America, for violations of the False Claims Act, 31 U.S.C. §3729, et seq., arising from

2

false claims made by the Defendants to the federal Medicaid and Medicare Programs for psychiatric hospital inpatient treatment which was unnecessary, excessive or not provided.

2.     The Relator was involuntarily committed to Zucker Hillside Hospital ("HILLSIDE"), a psychiatric hospital that is owned and operated by the North Shore Long Island Jewish Healthcare System ("LIJ"), and licensed by New York State to provide inpatient mental health services, from June 12th to 30th, 2011.   HILLSIDE committed Ms. Andersen under a New York State Mental Hygiene Law (NYMHL) "emergency detention" provision (§9.39), for which she did not qualify.   NYMHL §9.39 requires that a patient be dangerous in order to qualify for involuntary commitment, but HILLSIDE admitted in writing that the Relator was not dangerous at any time.  LIJ, as parent company of HILLSIDE, billed Medicaid, via United Healthcare, over $66,000 for services connected with Ms. Andersen's 18-day inpatient stay. LIJ also billed for laboratory services that were not performed.

3.     The fees charged by LIJ for the Relator's care were by definition unnecessary services, since she did not qualify for emergency detention, therefore they must be considered fraudulent for the purpose of Medicaid reimbursement.   Ms. Andersen is personally suing HILLSIDE in a separate action, <u>Andersen v. North Shore Long Island Jewish Health System – Zucker Hillside Hospital</u>, et. al., EDNY Civil Action No: 12-CV-1049 (JFB) (ETB), hereinafter referred to as <u>Andersen v. HILLSIDE</u>.

4.     The Relator collected evidence that the practice of billing Medicaid and Medicare fraudulently under NYMHL emergency detention provisions is widespread at North Shore Long Island Jewish Health System ("LIJ").   The Defendants' violations have resulted in patients receiving more services than necessary, services at usurious fee levels, and services billed but not performed, resulting in unwarranted cost to taxpayers.

5.     The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the

government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

6.      The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

7.      The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

8.      Under the Medicaid and Medicare Programs, (a) psychiatrists and other medical professionals, (b) mental health agencies, and (c) pharmacies, all have specific responsibilities to prevent false claims from being presented and are liable under the False Claims Act for their role in the submission of false claims.

9.      This is an action for treble damages and penalties for each false claim and each false statement under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

## II. PARTIES

10.     Relator, Lauren Andersen, is a citizen of the State of New York.  Her address is c/o Murphy & Lynch P.C., 1045 Oyster Bay Road, Suite 2, East Norwich, New York 11732.  Ms. Andersen is a 50-year-old woman with a history of psychiatric and physical disabilities.  She was going through divorce-related financial difficulties at the time of her admission to HILLSIDE, which necessitated her medical care being covered by a Medicaid managed care health insurance plan.  This enabled her to gather the information necessary to bring this lawsuit.  She has a bachelor's degree from Dartmouth College, and an MBA from Insead, France.  Ms. Andersen is also a former medical technology company Chief Executive Officer.

4

Prior to her serious medical problems, she enjoyed a modest level of success in business. Her MBA degree and business experience endowed her with the research and analysis skills necessary to write this case.

11.     North Shore Long Island Jewish Health System ("LIJ"), is headquartered at 145 Community Dr., Great Neck, New York, 11021, and owns HILLSIDE hospital, where the Relator was detained.  Defendant Michael J. Dowling is President and Chief Executive Officer of the health system. LIJ transacts business in the Eastern District of New York, and

> (a) submitted or caused to be submitted claims to Medicaid for hospital fees charged for alleged care of the Relator and other patients, and
>
> (b) upon knowledge and belief, continues to submit or cause to be submitted claims to the Medicaid and Medicare Programs for involuntary hospital inpatient treatment, which constitute false claims under the False Claims Act.

12.     Defendant UnitedHealth Group Inc. ("UH"), parent company of UnitedHealthcare, is headquartered at 9900 Bren Road East, Minnetonka, Minnesota 55343.  Defendant Stephen J. Hemsley is President and Chief Executive Officer of UH.  The company administers managed care plans in New York State that process fees from hospitals like LIJ's for reimbursement by Medicaid and Medicare.

## III. JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (Federal Question), and 31 U.S.C. §3732 (False Claims Jurisdiction) the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730 (False Claims).

14.     There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. §3730(e).

15.     Venue exists in the United States District Court for the Eastern District of New York pursuant to 31 U.S.C. § 3730, because all of the fraudulent acts occurred in this district, and

upon knowledge and belief, the Defendant transacts or has transacted business in the Eastern District of New York.

## IV. APPLICABLE LAW

### A.    Medicaid and Medicare

16.    Medicaid is a public assistance program providing for payment of medical expenses for low-income patients. Funding for Medicaid is shared between the federal government and state governments.  In New York State, the total Medicaid enrollment is 5m people (27% of the population), of which 77% are in a Medicaid managed care program.[1] In New York, total Medicaid spending is about $52 billion.

17.    Medicare is a public assistance program providing for payment of medical expenses for elderly and disabled patients.  The total Medicare enrollment in New York State is 3m (16% of the population), and New York's spending on Medicare is the second highest in the nation (7.2% of the country's total spending).   A patient can receive Medicare benefits either through the federal government or through a private insurance company.

18.    Inpatient mental health services are covered under Medicaid or Medicare only if the service is ordered for a medically accepted indication.

19.    Every Medicaid/Medicare provider must agree to comply with all requirements of CMS (the Center for Medicaid and Medicare Services, a division of HHS), in order to obtain reimbursement.

### B.    False Claims Act

20.    False Claims Act liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government. 31 U.S.C. §3729(a)(1)&(2).

---

[1] Source: the Kaiser Foundation, 2010 statistics -- http://www.statehealthfacts.org

21.     Under the False Claims Act, "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. §3729(b).

22.     The False Claims Act is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a course of conduct that causes the government to pay a false or fraudulent claim for money.

**C.      New York State Mental Hygiene Laws' Emergency Detention Provisions, and Tort of Unlawful Imprisonment**

23.     New York Mental Hygiene Law emergency detention provisions §§ 9.39 and 9.27 (Exhibit 2), which were used to detain the Relator, state that a patient must be a danger to herself or someone else to qualify for involuntary commitment under these statutes. Therefore, if the Hospital commits a non-dangerous patient under one of these statutes, fees for that inpatient stay must be considered by definition "unnecessary services", and therefore ineligible for reimbursement from Medicaid or Medicare.  Furthermore, that detention meets the criteria for false imprisonment:  (1) willful detention; (2) without consent; and (3) without authority of law.  The same applies to all of the other admissions provisions under section 9 of the NYMHLs.

**D.      Constitutional Right to Due Process (14th Amendment)**

24.     The Fourteenth Amendment to the Constitution provides Americans from being deprived of life, liberty, or property, without due process of law.  The Supreme Court said this requires consideration of three distinct factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the Government's involvement. Involuntary detention and commitment without correctly following the criteria and procedures laid out in the

NYMHL's emergency detention provisions deprive a patient of her entitlement to due process of law.

### E.    42 C.F.R. §482.13 – Centers for Medicare & Medicaid Services, HHS: Conditions of participation: Patients' Rights

25.    42 C.F.R. §482.13 states "All patients have the right to be free from physical or mental abuse, and corporal punishment... [as well as] restraint or seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff." It also specifies that restraint and seclusion can only be used in emergency situations if needed to ensure physical safety and if less restrictive interventions have been determined to be ineffective. A physician must also conduct a face-to-face assessment within one hour of the intervention. Seclusion in this context means "the involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving... Seclusion may only be used for the management of violent or self-destructive behavior." Restraint includes "A drug or medication when it is used as a restriction to manage the patient's behavior".

### V. ALLEGATIONS

26.    The Relator discovered, through her research for <u>Andersen v. HILLSIDE</u>, that LIJ submitted claims to the United Healthcare (a Medicaid managed care provider) for involuntary hospital inpatient treatments treatment to which Relator was subjected (Exhibit 1) that were either (a) unnecessary, excessive and grossly overpriced, or (b) never actually provided.

27.    The Relator received documentation from United that LIJ was paid $66,753.04 (or $3,708.50 a day), in fees for detaining her as an inpatient. This vastly exceeds the average cost per inpatient day in New York State, which is less than $2,000. The Hospital also charged $2,973 for alleged laboratory tests on Ms. Andersen, the results of which did not appear in the medical records, so one can assume that they were not performed.

28.      One of the other patients at HILLSIDE told Ms. Andersen that they were also being kept there against their will, and had requested a hearing to be discharged. One of them told her that, among other things, LIJ had billed Medicare for electrocardiograms that he complained were unnecessary. Two other former patients, Prasanna Goonewardena and Stanley Lozowski, who were also non-dangerous, informed the Relator that they had also been hospitalized unnecessarily under a section 9.39. Under NYS Education Law Section 6530, patients have the right to refuse unwanted professional services. Two of these plaintiffs have filed separate civil lawsuits against HILLSIDE.

29.      HILLSIDE has alleged that it did not deviate from the "standard of care" in Ms. Andersen's case, despite being notified that it detained Ms. Andersen illegally without a hearing.  "Standard of care" is defined as the caution that a reasonable person in similar circumstances would exercise in providing care to a patient. One may assume that if HILLSIDE did not deviate from its standard of care in detaining Ms. Andersen, that it does the same thing routinely to other patients, so that the damages that could be recouped for the United States are significant.

30.      After she had been detained for several days without a hearing or legal advice, Ms. Andersen called United Healthcare in desperation several times, explained her situation, and tried to cancel her medical coverage so that the Hospital would be financially motivated to discharge her, but UH refused to do so, telling her that she would have to personally visit the Nassau County Department of Social Services to cancel the coverage. The Hospital would not allow her to leave, even for a short time, so there was no way for her to cancel her coverage.

31.      With a capacity of about thirty patients, at over $3,700 a day, one ward (such as "3 Lowenstein", the ward where the Relator was detained) could generate over $1.35 million per patient or $40 million revenue a year. HILLSIDE has 236 beds, which could generate over $300 million annually at maximum capacity.  Furthermore, in addition to HILLSIDE, LIJ owns several other mental hospitals, and general hospitals which have psychiatric units, such as Nassau University Medical Center, Franklin Hospital, Huntington Hospital, Staten Island and South Oaks Hospital. It is reasonable to assume that the billing practices in the other LIJ mental hospitals are similar to HILLSIDE's, since billing is centralized. Exact

9

revenues attributable to psychiatric inpatient care in all of the LIJ health system's hospitals can be quantified in discovery.

32.	If these calculations are extrapolated to the approximately 7,000 private and general hospital beds in all of New York State, where billing practices are also likely to be similar to LIJ's, the numbers become astronomical. New York State's private psychiatric inpatient expenditures total approximately $1.7 billion a year.

33.	To compare the disparity between HILLSIDE's costs and its fees, for example, just one ward may have approximately twenty staff on duty full time at $150,000 annual average each (total $3 million, which is a high estimate since a psychiatrist makes on average $186,000 a year, a psychiatric nurse $66,000 and a mental health worker $53,000). The building might cost $500,000 a year to maintain (again a high estimate since the ward that the Relator was in is only about 10,000 sq. ft., part of a building with several other wards). One might budget $100 a day per patient for medications and equipment, and $50 per patient a day for administration. Added together that is only $5 million running costs, which indicates how enormously profitable this business is.

34.	The ward was near maximum capacity during the time the Relator was there but even at less than half capacity it would still be a cash cow. Unsurprisingly, HILLSIDE is managed by an accountant, not a physician – i.e. Joseph M. Schulman, the Hospital's Executive Director. That is illustrative of where the Hospital's priorities lie – in its bank accounts, not in the health of patients.

35.	The Relator noted that many of the patients at HILLSIDE are on Medicaid or Medicare. After she was discharged, she called the Hospital anonymously, posing as a patient with no insurance whose family would pay for her Hospital fees, and the John Doe staff member with whom she spoke immediately suggested that he apply for emergency Medicaid status on her behalf instead of accepting payment. He acknowledged that many of HILLSIDE's patients are on Medicaid. It was obvious when the Relator talked to the patients that many of them were there because they needed somewhere to sleep and get a hot meal, not because they were ill enough to be hospitalized. If one estimated conservatively that 50% of patients are on Medicaid or Medicare, the total could be $150m annual revenues for

the whole hospital. Even if one only estimated 25% of those services were unnecessary, excessive, or not provided, which can be verified in discovery, that still amounts to $37.5m a year, which is certainly worth recovering. It could be over $250m for all of the LIJ hospitals that offer psychiatric inpatient services.

36.    The Relator reports that the so-called "outpatient social worker", Marta Filleborn, who was assigned to her by Rachel Jacobson (the inpatient social worker) when she was discharged, billed her insurance company $1,000 for an involuntary "home visit" after her discharge. This consisted of Ms. Filleborn meeting her in the parking lot of her doctor's office for no more than five minutes and asking her a few questions while Ms. Andersen was getting out of her car for an appointment with her internist. This was another example of unwanted and unnecessary services, billed at inflated cost.

### Calculating damages

37.    It would be relatively easy to calculate the total damages to the federal government related to improper use of emergency detention provisions; one would only have to evaluate medical records, from each hospital, of patients admitted under the "emergency detention" provisions of the NYMHLs, and determine whether each patient had been considered dangerous or not, which is a simple "yes/no" question that is required to be answered by hospital staff every day in a patient's records. If he or she were not recorded as dangerous, it means that the law was incorrectly applied. One would only have to cross-reference with the corresponding invoice to determine damages. A sampling from each hospital would be adequate to establish a pattern, and from that, extrapolate a percentage of total claims that were improper; one could thereby easily estimate total damages.

38.    To estimate excessive fees per diem, one would simply subtract the average or expected per diem charge for an inpatient bed in New York State during the applicable year from the amount actually paid by Medicaid/Medicare to the Hospital. In the Relator's case, the discrepancy would be about $1,800, based on an average per diem. Based on the expected per diem determined by the House Oversight Committee, it could be as high as $2,500.

11

39.    The Relator met with Ryan Ricker, an investigator at New York State's Medicaid Fraud Unit, to report this matter on November 28th, 2012. Mr. Ricker subsequently told her on the phone that the State declined to take further action against LIJ, which led the Relator to file this *qui tam* complaint. The Relator also copied her correspondence with Mr. Ricker to Timothy Geithner, who was at the time U.S. Treasury Secretary. She had produced a valuable report in 2009 for Mr. Geithner, which could lead to some controversy if it were made public. The document is still being treated as confidential for the time being, and she did not discuss it with the staff at HILLSIDE for this reason.

## Retaliation Against the Relator

40.    The Defendant and associated parties have targeted Ms. Andersen with a number of threats and retaliatory actions since she was discharged in June 2011. She has already witnessed three significant vindictive acts since Andersen v. HILLSIDE was filed, so it is likely that others will follow. Since March 1st, 2012, various LIJ-affiliated doctors in positions of power have (1) advised the Relator to drop her case, (2) failed to renew critical prescriptions, intimating that if she did not drop her case, further prescriptions might be withheld, and (3) charged her fourteen times the market rate for a surgical procedure, and threatened to sue her to collect the vast sum in excess of the amount already paid (which also exceeded the market rate). The threats have become more overt in recent weeks, since the Relator filed documents with the court that are even more damning of the Defendants' behavior.

41.    The Defendants' aggressive retaliatory behavior threatens Ms. Andersen's physical and mental health, which are already in a delicate state. She could quickly become seriously ill or die if she were not able to renew her psychiatric prescriptions on a timely basis. She has a rare pre-cancerous gastrointestinal condition that could lead to cancer if not monitored carefully by a highly qualified specialist. Moreover, she does not have adequate financial resources to pay fourteen times the market rate for every medical procedure that she and her family undergo. It is difficult enough for the Relator to recover from the abuse that the Defendants inflicted on her in June 2011, without the further emotional distress caused by threats and retaliatory actions.

42.     It is vitally important for any patient to be able to trust her doctors. A psychiatrist has an even more significant moral obligation to his patients than a medical doctor has, and even than a priest has to his parishioners. Psychiatric patients tend to be vulnerable people, who tell their doctor not only their sins, as they would to a priest, but also the most intimate details of their lives and their entire medical histories. Furthermore, the psychiatrist prescribes medications for his patients that are dangerous if used incorrectly. So, for a psychiatrist to abuse a patient, then threaten her with further retaliation if she reports it, is the ultimate act of malpractice, and an experience more stressful than any other for a patient. This intimidation has been distressing for Ms. Andersen, and it shows no signs of relenting, which explains the need for injunctive relief.

## VI. CAUSE OF ACTION

**43.**     Relator alleges that LIJ psychiatrists, psychologists, nurses and other mental health workers routinely approve, through their actions or omissions, hospital inpatient services that are either (a) unnecessary and excessive or (b) never actually provided, thereby causing claims for such services to be made to Medicaid or Medicare for reimbursement (1) with actual knowledge; (2) in deliberate ignorance; or (3) in reckless disregard that such claims are false, and are liable under the False Claims Act therefor. HILLSIDE psychiatrists, psychologists, nurses and other mental health workers have knowingly and intentionally created a culture of non-compliance with state and federal regulations, wherein the overriding goal is to strive to admit every individual who (a) is brought to the Hospital involuntarily, or (b) applies for Medicaid or Medicare approval voluntarily, regardless of his or her condition or qualification for inpatient treatment.

**44.**     By knowingly and intentionally approving such services for payment, or refusing to terminate such services when they are presented for payment, UH is complicit in LIJ's violations of the False Claims Act.

## Unlawful Imprisonment
## and violations of New York Mental Hygiene Laws

45.     HILLSIDE detained Ms. Andersen under New York State Mental Hygiene Law § 9.39:
Emergency admissions for immediate observation, care, and treatment.  However, the
Relator did not fulfill either of the two criteria for admission under § 9.39 – danger to
oneself or danger to others.  The fact that Ms. Andersen was non-dangerous is made crystal
clear in admitting psychiatrist Dr. Brar's Mental Status Exam (Exhibit 4).  HILLSIDE never
served Ms. Andersen with written notice of her status, which is required under § 9.39.  In
fact the only document in the medical records which indicated that a § 9.39 was applied was
a form filled out by an unidentified person with an illegible signature the day after the
Relator's admission, listing a pile of documents that were never given to the Relator, with
"Pt 939" on the patient signature line.  This constituted negligence, malpractice in the
exercise of medical judgment and false imprisonment on the part of Brar and HILLSIDE.

46.     New York Mental Hygiene Law §9.39 states in no uncertain terms that a patient
must be a danger to herself or someone else to qualify for commitment under this statute.
The exact wording is as follows: "§9.39 Emergency admissions criteria: Hospital may retain
a patient for a period of fifteen days any person alleged to have a mental illness which is
likely to result in serious harm to himself or others. 'Likelihood to result in serious harm'
shall mean: (1) substantial risk of physical harm to himself as manifested by threats of or
attempts at suicide or serious bodily harm or other conduct demonstrating that he is
dangerous to himself, or (2) a substantial risk of physical harm to other persons as
manifested by homicidal or other violent behavior by which others are placed in reasonable
fear of serious physical harm." Dr. Brar acknowledged in writing that Ms. Andersen was
NOT a danger to herself or anyone else, but committed her anyway.

47.     HILLSIDE violated §9.39 a second time.  Under §9.39, another staff psychiatrist must,
within 48 hours after admission, examine the patient and confirm the first doctor's finding
that the patient meets the Emergency Standard.  New York State Office of Mental Health
(OMH) form "OMH 474" (Exhibit 3) must be filled out and given to the patient, but the
Defendant did not do so.  The medical records show that after 48 hours, Ms. Andersen still

did not meet the two criteria for admission under § 9.39 – danger to oneself or danger to others.

48.      HILLSIDE violated New York Mental Hygiene Law a third time, when the chief of the unit, Dr. Mendelowitz, served the Relator with a form OMH 471, "Conversion to involuntary status" under §9.27, on June 27th, 2011, fifteen days after admission (Exhibit 5). However, the Relator did not meet the criteria for detention under § 9.27. The exact wording of § 9.27 allows involuntary commitment if the "person has a mental illness for which care & treatment in a mental hospital is essential to his/her welfare; person's judgment is too impaired for him/her to understand the need for such care and treatment; as a result of his/her mental illness, the person poses a substantial threat of harm to self or others." The form requires an explanation of why the physician believes that the patient meets the criteria for 9.27, but none was provided. Furthermore, only one physician signed the form, whereas the law requires two signatures. The form does not even identify the signing physician; there is only an illegible scrawl on the signature line. Additionally, the form was incorrectly filled out, with missing information, and it was not copied to the Relator's own physician, family, or anyone else.

49.      Emergency detention and involuntary commitment, forcible stripping and forcible injection meet the definition of restraint and seclusion, and therefore do not qualify for reimbursement under 42 C.F.R. §482.13.   Any fee by a hospital arising from such "treatments" performed on any patient is therefore necessarily disqualified for the purposes of Medicaid and Medicare reimbursement. The Relator was restrained and secluded by being involuntarily committed to HILLSIDE, and was also restrained and secluded in several places within the Hospital, including (1) a tiny cubicle in the emergency room, although it was not an emergency, (2) her bedroom during the forcible stripping episode, (3) the "quiet room" after the forcible stripping, and (3) her bedroom during the forcible injection. She was physically restrained by both female and male staff in the forcible stripping and forcible injection episodes.   Since the Defendant restrained and secluded the Relator in non-emergency situations and without attempting less restrictive interventions, they violated 42 C.F.R. §482.13.

## Violations of Patients' Constitutional rights

**50.**      There are three elements required to bring an action for violations of Constitutional rights, under 42 U.S.C. §1983 and §1985.  The relator must prove the following: (1) He or she was deprived of a specific right, privilege, or immunity secured by the Constitution or laws of the United States; (2) The alleged deprivation was committed under color of state law; and (3) The deprivation was the proximate cause of injuries suffered by the relator.

**51.**      The Defendants violated the Relator's Fourteenth Amendment rights not to be deprived of life, liberty, or property, without due process of law.  The Supreme Court said this requires consideration of three distinct factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the Government's involvement.

52.      Involuntary detention and commitment without legal advice or a hearing prevented the Relator from her entitlement to due process of law.  HILLSIDE committed Ms. Andersen under a law that did not apply to her, failed to serve her with written notice of her status, which is required under § 9.39 and 9.27, and never allowed her a hearing to be discharged.  The Relator's argument that the Defendants were operating under color of state law is discussed at length in her civil action, <u>Andersen v. HILLSIDE.</u>  Because she was deprived of due process, Ms. Andersen was detained for 18 days, resulting in the fraudulent claims submitted to and paid by the US Government.

53.      Defendants Dowling and Hemley have the ability to control the policies of LIJ and UH, respectively, and are therefore in a position of authority and have the power and discretion to perform potentially discriminatory acts.  As CEOs of their organizations, they failed to train and supervise their staff properly, and this failure resulted in the incidents that violated the Relator's rights and caused false claims to be submitted to the United States.  In their executive capacities they 1) created a policy under which unconstitutional and unlawful practices occurred, or allowed the continuance of such a policy, and/or 2) were grossly negligent in training and supervising subordinates who committed the

wrongful acts. Therefore, Dowling and Hemley are liable for the harm caused by the unlawful actions of their staff.

**54.** The Defendants also violated the Relator's rights under 42 U.S.C. §1985. The essential elements of a 42 U.S.C. § 1985 claim are: (1) a conspiracy; (2) to deprive a plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom. It is not necessary to prove that each conspirator was involved in all stages of the planning or knew all of the details involved.

**55.** As mentioned in the foregoing, the Relator called United Healthcare while she was in the Hospital, explained her situation, and tried to cancel her medical coverage so that HILLSIDE would be financially motivated to discharge her. She explained to UH that she was being held at HILLSIDE without a hearing, although she was non-dangerous. However, UH refused to do cancel coverage, so the Hospital would not discharge her. UH's refusal to cancel coverage, and conspiracy with LIJ to detain the Relator and bill Medicaid for the Relator's detention, despite having been warned that these fees were contrary to law, was therefore a proximate cause of the Relator's injuries and the damage to the United States.

## VII. DEFENDANTS' LIABILITY

56. By virtue of the acts described above, Defendants knowingly conspired to (a) submit, and continue to submit, and/or (b) cause and/or continue to be submitted, false or fraudulent claims to the United States Government for involuntary hospital inpatient treatments that were either (a) unnecessary and excessive or (b) never actually provided.

57. The US Government, unaware of the falsity of the records, statements or claims made by the Defendants or the conspiracy involved, paid and continues to pay such false claims, directly and through United Healthcare, which would not otherwise have been allowed.

58.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## VIII. CONCLUSION

59.     New York State's total annual expenditure on mental health care of $4.965 billion is nearly the highest in the nation, second only to California's.  New York has recently come under fire from Congress for overcharging Medicaid for services related to mental health care.  The House Committee on Oversight and Government Report in late 2012 charged that New York overbilled Medicaid by a staggering $15 billion over a 20-year period for services to the developmentally disabled.  Under the agreement approved by the feds, Medicaid payments will fall to $1,200 per resident per day from more than $5,100.  The House Oversight Committee said that the new rates would save taxpayers $1.2 billion over the next 18 months.[2]

60.     New York's profligate spending has meant that taxpayers from other states have been subsidizing New Yorkers' health care.  If Medicaid and Medicare reimbursement for inpatient care to private New York mental hospitals like LIJ's were reduced from the $3,700 a day reported by the Relator, to more modest levels, additional savings could be reaped.

61.     New York's psychiatric inpatient expenditures total approximately $2.9 billion a year, accounting for 53 percent of total mental health spending in the state.  Private care accounted for $1.7 billion, or 59% of total inpatient spending.  New York State has more than twice the national average of psychiatric inpatient days per thousand, a disparity which is indefensible.  Even OMH itself admits, "New York State should develop inpatient reimbursement methods that set goals for access to care while reducing incentives for long lengths of stay... the system remains too reliant upon inpatient services."[3]

62.     And yet, strong incentives remain in the system for private hospitals to institutionalize people unnecessarily and unfairly for financial gain.  The following damning

---

[2] "Medicaid payments slashed in deal between Feds and Cuomo", New York Post, by G. Shields and C. Campanile, April 1, 2013.

[3] http://www.omh.ny.gov/omhweb/clinic_restructuring/ambulatory_restructuring_project/report.h tml#ftn

excerpt is from an article entitled "The Privatization of the Civil Commitment Process and the State Action Doctrine: Have the Mentally Ill Been Systematically Stripped of Their Fourteenth Amendment Rights?"[4]

> The increase in private, for-profit hospitalization has resulted in the proliferation of pernicious actions designed to increase the profitability of hospitals. Psychiatric hospitals have lured individuals into psychiatric treatment by instituting massive advertising campaigns designed to promote the benefits of treatment. However, once hospitalized, patients found it not so easy to leave, at times facing intimidation from hospital staff when they decided they no longer wanted to receive inpatient care and treatment.
>
> Moreover, the attempts to increase revenue by private psychiatric hospitals have not stopped with attempts to procure voluntary admissions. Private hospitals seek to maintain certain census levels on the wards. Some hospitals have used "bounty hunters" to transport possible candidates for involuntary hospitalization. Hospitals have based the length of the patient's confinement not on the individual's clinical condition but on the length of insurance coverage, discharging individuals once insurance has expired. Not surprisingly, the emphasis on profits has resulted in private hospitals admitting individuals who did not need inpatient hospitalization.

63.     Reducing the expenditure on hospitalizing people unnecessarily could yield vast savings, some of which could be redeployed for preventive care, and treating mental disorders that currently go untreated. Fewer than one-third of adults and one-half of children with a diagnosable mental disorder receive mental health services in a given year.[5] It is far cheaper for a patient to live in the community, with round-the-clock caregivers, than it is to institutionalize him... in fact, he could be surrounded by several caregivers 24/7 for less than $3,700 a day. The overall cost of care for dementia patients in America, for example, already exceeds that for cancer and heart disease. With the number of Alzheimer's patients expected to triple in the United States by 2050, expenditure for care of patients with dementia will become untenable in the absence of more cost effective solutions.

64.     The mental health care system in New York must be restructured to provide better quality care at lower cost. That is an achievable goal, with the help of cases such as this one.

---

[4] William Brooks, Touro Law Center, (40 Duq. L. Rev. 1 2001-2002).

[5] Source: NAMI (National Alliance on Mental Illness).

## VIII. PRAYER FOR RELIEF

WHEREFORE, Relator Lauren Andersen requests that the Court enter the following relief:

A. That permanent injunctive relief be granted to prevent further violations by the Defendants under 31 U.S.C. §3729 *et seq.*

B. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each false claim in violation of 31 U.S.C. §3729;

C. That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act.

D. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

E. That Relator recover such other relief as the Court deems just and proper.

The Relator demands a jury trial on all claims alleged herein.

Dated April 30th, 2013                    Respectfully submitted:

Lauren Andersen, Relator

**Certificate of Service**

The undersigned hereby certifies that a copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses has been served on the Government as provided in FRCP 4.

Dated April 30th, 2013

_____

Lauren Andersen

*RELATOR'S COMPLAINT: <u>ANDERSEN v. LIJ and UH</u>*

# **EXHIBIT 1**

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

## EXHIBIT 1

## Relator's Invoice from Zucker Hillside Hospital

295ZDDEIU20082901

**Page:  1 OF 2**       37441

**UnitedHealthcare®**
A UnitedHealth Group Company

**UNITED HEALTHCARE SERVICES, INC.**
**P.O. BOX 1459-ROUTE MN010-S155**
**MINNEAPOLIS MN 55440-1459**

If you have any questions, please write or
call our Customer Service Department at:

MEMBER SERVICES
ONE PARK PLACE, 3RD FLOOR
ALBANY                    NY 12205

518-437-4109 OR
1-800-396-7177

## EXPLANATION OF BENEFITS

### THIS IS NOT A BILL

| Patient: | LAUREN | | Date: | 09/13/11 |
| Number: | | | Policy: | UHC OF NY-FHP W/COPAY UBH |

| Claim Number | Type of Service | Date of Service | Total Charges | Not Covered Amount | Deductible | Copay | Total Patient Cost |
|---|---|---|---|---|---|---|---|
| 060189316 | P ZUCKER HILLSIDE HOSPITAL | | | | | | |
| | ROOM & BOARD | 6/12/11- 6/30/11 | 61,560.00 | 0.00 | 0.00 | 25.00 | 25.00 |
| | PHARMACY CHG | | 4.04 | 0.00 | 0.00 | 0.00 | 0.00 |
| | LABORATORY | | 2,732.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | LABORATORY | | 71.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | LABORATORY | | 95.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | LABORATORY | | 75.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | EMERGENCY RM | | 1,429.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | MEDICAL SVC | | 145.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | EKG / EEG | | 642.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | ** INTEREST AMOUNT ** 167.77 | | | | | | |
| **TOTALS** | | | 66,753.04 | 0.00 | 0.00 | 25.00 | 25.00 |

Payment has been made to:       Amount:    Deductible/copay accumulations for:    1/01/11-12/31/11

ZUCKER HILLSIDE HOSPITAL       CONTRACTED FEE       0.00 OF   25 INDIVIDUAL COMBINED LIMIT

SEE NEXT PAGE FOR ADDITIONAL INFORMATION

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

## EXHIBIT 2

## EXHIBIT 2

## Relevant excerpts from New York State Mental Hygiene Laws

**N.Y. Mental Hygiene Law § 9.39:** NY Code - Section 9.39: Emergency admissions for immediate observation, care, and treatment

(a) The director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and <u>which is likely to result in serious harm to himself or others. "Likelihood to result in serious harm" as used in this article shall mean:</u>
<u> 1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or</u>
<u> 2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.</u>

**N.Y. Mental Hygiene Law § 9.27 :** Involuntary admission on medical certification.

(a) The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the <u>certificates of two examining physicians, accompanied by an application for the admission of such person</u>. The examination may be conducted jointly but each examining physician shall execute a separate certificate.
(b) Such application must have been executed within ten days prior to such admission....
(c) Such application shall contain a statement of the facts upon which the allegation of mental illness and need for care and treatment are based and shall be executed under penalty of perjury but shall not require the signature of a notary public thereon.
(d) <u>Before an examining physician completes the certificate of examination of a person for involuntary care and treatment, he shall consider alternative forms of care and treatment that might be adequate to provide for the person's needs without requiring involuntary hospitalization.</u> If the examining physician knows that the person he is examining for involuntary care and treatment has been under prior treatment, he shall, insofar as possible, consult with the physician or

25

psychologist furnishing such prior treatment prior to completing his certificate. Nothing in this section shall prohibit or invalidate any involuntary admission made in accordance with the provisions of this chapter.

(e) <u>The director of the hospital where such person is brought shall cause such person to be examined forthwith by a physician who shall be a member of the psychiatric staff of such hospital other than the original examining physicians whose certificate or certificates accompanied the application</u> and, if such person is found to be in need of involuntary care and treatment, he may be admitted thereto as a patient as herein provided.

(f) Following admission to a hospital, no patient may be sent to another hospital by any form of involuntary admission unless the mental hygiene legal service has been given notice thereof.

...

N.Y. Mental Hygiene Law §§ 9.37 and 9.40 are also emergency detention provisions and are similarly worded.

(http://www.omh.ny.gov/omhweb/forensic/manual/html/mhl_admissions.htm#)

*RELATOR'S COMPLAINT: <u>ANDERSEN v. LIJ and UH</u>*

# **<u>EXHIBIT 3</u>**

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

## Exhibit 3
## New York Office of Mental Health, form 474, "Emergency Admission"

Form OMH 474 (2-94)

State of New York
Office of Mental Health

| Patient's Name (Last, First, M.I.) | "C" No. |
| --- | --- |

**EMERGENCY ADMISSION**
Section 9.39 Mental Hygiene Law

Sex ................................. Date of Birth ...............

| Facility Name | Unit/Ward No. |
| --- | --- |

**I. General Provisions for Emergency Admission**

A. In order for a person to be admitted to a hospital according to Section 9.39 of the Mental Hygiene Law, all the following requirements must be met:
  1. The hospital must be approved by the Commissioner of Mental Health to receive and retain patients according to this Section;
  2. The person must be alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others. "Likelihood to result in serious harm" means:
    — a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself *("other conduct" shall include the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, provided that such refusal or inability is likely to result in serious harm if there is not immediate hospitalization),* or
    — a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.
  3. A staff physician of the admitting hospital must examine the person and find that the person meets the standard for admission under this Section. The physician then completes this Form, OMH 474, Emergency Admissions.

B. A person who is alleged or appears to be mentally ill may be taken into custody, transported, or removed to a hospital approved to accept emergency admissions, according to the following sections of the Mental Hygiene Law:
  — Section 9.41 - Powers of Certain Peace Officers and Police Officers, Form OMH 474A/476A, I
  — Section 9.43 - Powers of Courts - Form OMH 465, Civil Order for Removal to Hospital
  — Section 9.45 - Powers of Directors of Community Services, Form OMH 474A/476A, II
  — Section 9.55 - Powers of Qualified Psychiatrists, Form OMH 474A/476A, III .
  — Section 9.57 - Powers of Emergency Room Physicians, Form OMH 474A/476A, IV

C. On admission, the person will be given a written notice of status and rights as a patient admitted according to MHL Section 9.39. This notice will also be given to the Mental Hygiene Legal Service and up to three other persons designated by the person admitted.

If a person admitted according to this Section is to be retained in the hospital for more than 48 hours, another physician, who is a member of the psychiatric staff of the hospital, must examine the person and confirm the admitting physician's findings by completing page 2 of this form (OMH 474).

Within 15 days of admission, if it is determined that the person is not in need of involuntary care and treatment, s/he shall be discharged unless s/he is suitable and agrees to remain as a voluntary patient. If the person is in need of continued inpatient care and treatment, and is not suitable or will not agree to remain as a voluntary patient, s/he may be retained beyond 15 days only by completion of an application and two medical examinations as required for admission according to MHL Section 9.27 - Involuntary Admission on Medical Certification.

**II. Record of Admission**

A. The above-named person was brought to this hospital by:

Name

| Title/Badge No. (as appropriate) | Address | Phone |
| --- | --- | --- |

| Relationship to Person | Address of Person | Time of arrival at hospital: | MONTH | DAY | YEAR | HOUR | MINUTE | ☐ A.M. ☐ P.M. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

B. Circumstances which led to the person being brought to this hospital:
(If applicable) Person was taken into custody, transported, or removed to this hospital in accordance with MHL Section _____

_____

_____

_____

_____

_____

C. I HAVE EXAMINED THE ABOVE-NAMED PERSON PRIOR TO ADMISSION AND FIND THERE IS REASONABLE CAUSE TO BELIEVE THAT THE PERSON HAS A MENTAL ILLNESS FOR WHICH IMMEDIATE OBSERVATION, CARE AND TREATMENT IN A MENTAL HOSPITAL IS APPROPRIATE AND WHICH IS LIKELY TO RESULT IN SERIOUS HARM TO HIMSELF OR HERSELF OR OTHERS.

| Physician's Signature | | MONTH | DAY | YEAR | HOUR | MINUTE | ☐ A.M. ☐ P.M. |
| --- | --- | --- | --- | --- | --- | --- | --- |

**RELATOR's NOTE: Admitting Psychiatrist Dr. Brar was required by New York Mental Hygiene Laws to fill out and serve this form**  **on the Relator,  but failed to do so. Ms. Andersen did not meet the criteria for section 9.39, which are clearly defined here as requiring imminent physical dangerous-ness.**

28

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

Form OMH 474 (2-94) page 2

State of New York
Office of Mental Health

| EMERGENCY ADMISSION<br>Section 9.39 Mental Hygiene Law | Patient's Name (Last, First, M.I.) | "C" No. |
|---|---|---|

**III.  Examination to Confirm Need for Extension of Emergency Admission Beyond 48 Hours**

A.  Pertinent and Significant Factors in Patient's Medical and Psychiatric History:

B.  Physical Condition (Including any special test reports):

C.  Mental Condition: The conduct of the patient (including statements made to me by others) has been:

D.  The patient shows the following psychiatric signs and symptoms:

E.  Does the patient show a tendency to cause serious harm to him/herself? ☐ Yes ☐ No   to others? ☐ Yes ☐ No

If yes, explain: _____

F.  Mental diagnosis (if determined): _____

**IV.  Psychiatrist's Confirmation**

I have personally observed and examined _____ on: 

| MONTH | DAY | YEAR | HOUR | MINUTE | ☐ A.M.<br>☐ P.M. |

(Patient's Name)

Based on such examination and the case history, I hereby confirm that there is reasonable cause to believe that the patient has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others. The facts stated and information contained herein are true to the best of my knowledge and belief.

I am on the psychiatric staff of _____ Hospital. _____

(Signature)

**RELATOR's NOTE:** Dr. Brar should have filled out and served this form on the Relator, but failed to do so.  She could not have done so without lying in section IV.



29

*RELATOR'S COMPLAINT: <u>ANDERSEN v. LIJ and UH</u>*

# **EXHIBIT 4**

*RELATOR'S COMPLAINT: <u>ANDERSEN v. LIJ and UH</u>*

## EXHIBIT 4

### Excerpt from medical records: admission report, with relevant sections highlighted

| ANDERSEN,LAUREN | LIJ MR #: | 000002376407 | ADM DATE: | 06/12/2011 |
|---|---|---|---|---|
| 48 Y/O F | BHIS ID: | 173608 | EPISODE #: | 2 |
| DOB: 10/31/1962 | ACCOUNT #: | 000051037721 | UNIT: | HLW3 |

THE ZUCKER HILLSIDE HOSPITAL INPATIENT SERVICE

### INPATIENT BRIEF ADMITTING/LEVEL OF CARE NOTE

**Relator's Note:**

**Admitting psychiatrist Dr. Brar says "Patient is currently refusing inpatient admission... Patient is benefit (sic) from inpatient admission for med management." These are not criteria for admission under section 9.39.**

**➡**

**(Text which was either incorrect information or too intimate is blacked out.)**

Date of Service:      6/12/2011

Service Performed By:   HARSIMRAN BRAR  MD

Service Code:      Resident Admission

The patient presents now with the following acute symptoms and behavior:

Patient is 48 yr old female with history of Bipolar Disorder with psychotic features ,

Patient reports that since the time she has written the book "Spooked Fear and Loathing on Capitol Hill" , there has been lot of bullying towards her

reported that since last week patient has been overwhelmingly stressed staying with her verbally and now physically aggressive husband, and her parents moved her and her 7 yr old son to their basement apartment.

Her recent stressor has been marital issues which has affected the patient immensely. Patient has been in treatment with Dr Howard Kirschen

PMH- has history of adenomatous polyposis  s/p colectomy done in 8 yrs ago.

**REASON FOR ADMISSION:**

Complex Case:

PATIENT IS VERY IMPULSIVE, IS NOT ON APPROPRIATE MEDS, WOULD BENEFIT FROM INPATIENT ADMISSION

**SUMMARY/FORMULATION:**

A/P  48 yr old female with history of Bipolar disorder, presenting with increased paranoia, some depressive symptoms secondary to her life situation at this time. Patient is currently refusing inpatient admission. She endorses

**PLAN/RECOMMENDATION(S):**

1)Patient is benefit from inpatient admission for med management . 2)She does not require 1:1 , will benfit for q 20 checks for safety 3)Will begin taper her Effexor as patient is currently manic

Printed on 6/12/2011  9:15:41PM     EPN05V02R05 (PF)   INPATIENT BRIEF ADMITTING/LEVEL OF CARE NOTE  Page 1 of 2

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

| ANDERSEN, LAUREN | LIJ MR #: | 000002376407 | ADM DATE: | 06/12/2011 |
|---|---|---|---|---|
| 48 Y/O F | BHIS ID: | 173608 | EPISODE #: | 2 |
| DOB:   10/31/1962 | ACCOUNT #: | 000051037721 | UNIT: | HLW3 |

THE ZUCKER HILLSIDE HOSPITAL INPATIENT SERVICE

## MENTAL STATUS EXAM

| | |
|---|---|
| Assessment Date: | 06/12/2011 |
| Assessment Performed By: | HARSIMRAN BRAR  MD |
| Participation: | Full |
| Appearance: | Appropriately attired, Good eye contact |
| Activity/Behavior: | Impulsive, Hostile |
| Speech: | Within normal limits |
| Range of Affect: | Constricted, Labile |
| Quality of Affect: | IRRITABLE, HOSTILE |
| Thought Form: | Illogical |
| Thought Content: | Delusions, Suspiciousness, Ideas of reference, PARANOIA |
| Perceptional Disturbances: | None |

**SUICIDALITY**

| | | |
|---|---|---|
| Attempt Associated with Current Episode: | No | |
| Lethality: | Low | |
| | **Current Ideation** | **Past 6 Months** |
| Ideation: | None | None |
| Number of Attempts: | 1 | |
| Describe Other Previous Attempts: | OD IN THE PAST | |
| Access to Firearms: | No | |

**HOMICIDAL THOUGHTS / AGGRESSIVE BEHAVIOR**

| | |
|---|---|
| Homicidality: | Absent |
| Orientation/LOC: | Oriented X3 |
| Insight: | Poor |
| Judgment: | Poor |

**RELATOR's NOTE:**
**Admitting Psychiatrist Dr. Brar clearly acknowledges at left and below that Relator was non-dangerous: not suicidal, not homicidal, not aggressive... i.e. she did not meet the criteria for section 9.39.**

Filed By:  HARSIMRAN BRAR  MD
Filed On:  06/12/2011      09:07 PM

Electronic signature of author / supervising reviewer on file.

Printed on 6/12/2011  9:07:50PM

EMR50V01R01 (PF)  MENTAL STATUS EXAM  Page 1 of 1

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

# **EXHIBIT 5**

*RELATOR'S COMPLAINT: ANDERSEN v. LIJ and UH*

## EXHIBIT 5

## Notice of Status and Rights - Conversion to Involuntary Status

Form OMH 471 SR2 (05-08)

New York State
Office of Mental Health

**NOTICE OF STATUS AND RIGHTS
CONVERSION TO INVOLUNTARY STATUS**
(to be given to the patient at the time of
conversion to involuntary status)

Section 9.27 Mental Hygiene Law

| Patient | ZHH | 51037721 |
|---|---|---|
| | ANDERSEN, LAUREN | |
| | MR 2376407 | F | 48Y |
| | DOB 10/31/1962 | |
| Ser | LYUDMILA KARLIN | |
| | 06/12/11 | |
| Facility N | | |

| Admission Date To Inpatient Care: | 6 | 12 | 11 |
|---|---|---|---|
| | Mo. | Day | Yr. |
| Conversion Date: | 6 | 27 | 11 |
| | Mo. | Day | Yr. |

TO: _____

Based upon the certificates of two examining physicians, you have been converted to involuntary status at this hospital which provides care and treatment for persons with mental illness. You may be kept in the hospital for a period of up to 60 days from the date of your initial admission to inpatient care (if you were previously an emergency-status or C.P.E.P. emergency-status patient), or up to 60 days from the date of conversion (if you were previously a voluntary-status or informal status patient), unless you have had a court hearing, or an application has been filed for a court hearing. During this 60 day period you may be released, or converted to voluntary or informal status, if you are willing to continue receiving inpatient care and treatment and are suitable for such status.

You, and anyone acting on your behalf, should feel free to ask hospital staff about your condition, your status and rights under the Mental Hygiene Law, and the rules and regulations of the hospital.

If you, or those acting on your behalf, believe that you do not need involuntary care and treatment, you or they may make a written request for a court hearing. Copies of such a request will be forwarded by the hospital director to the appropriate court and the Mental Hygiene Legal Service.

**MENTAL HYGIENE LEGAL SERVICE**

The Mental Hygiene Legal Service, a court agency independent of this hospital, can provide you and your family with protective legal services, advice and assistance, including representation, with regard to your hospitalization. You are entitled to be informed of your rights regarding hospitalization and treatment, and have a right to a court hearing, to be represented by a lawyer, and to seek independent medical opinion.

You, or someone acting on your behalf, may see or communicate with a representative of the Mental Hygiene Legal Service by telephoning or writing directly to the office of the Service or by requesting hospital staff to make such arrangements for you.

The Mental Hygiene Legal Service representative for this hospital may be reached at:

BUILDING 73 CRU 25
80-45 WINCHESTER BLVD
QUEENS VILLAGE, NY 11427
718-264-3340

THE ABOVE PATIENT HAS BEEN GIVEN A COPY OF THIS NOTICE.

6-27-11

_____            _____
Signature of Staff Physician                    Date

COPIES TO: _____

_____
(Original Applicant)

COPIES TO: Persons designated by patient to be informed of admission.
(If None, type in "NONE".)

_____

_____
(Nearest Relative)

_____

_____

*A copy of this Notice of Status and Rights is also being sent to the Mental Hygiene Legal Service.
State and Federal Laws prohibit discrimination based on race, color, creed, national origin,
sexual orientation, military status, age, sex, marital status or disability.*

**Relator's Note: form requires MHLS to provide legal advice and a hearing** ➡

**Relator's Note: only one physician signed, the signature is unidentified, and no copies were issued to third parties** ➡